UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LADARIUS MARSHALL,

        Petitioner,

    v.                                            Case No. 15-CV-008

SCOTT ECKSTEIN,

        Respondent.

## DECISION AND ORDER GRANTING PETITION FOR RELIEF UNDER § 2254

Having fully exhausted his state court remedies, Petitioner Ladarius Marshall seeks federal relief under 28 U.S.C. § 2254 from his state court conviction for second-degree reckless homicide while armed and as a party to a crime, as well as possession of a dangerous weapon by a child. He alleges in his petition that incriminating statements he made to detectives should have been suppressed because they were involuntary and obtained in violation of his Fifth Amendment right to remain silent under *Miranda v. Arizona*, 384 U.S. 436 (1966). For the reasons that follow, Marshall's petition will be granted.

## BACKGROUND

### A. Marshall's Arrest and Interrogation

This case arises out of the death of Lavare Gould, who was shot and killed just before midnight on June 16, 2008, in the 2600 block of North 37th Street in Milwaukee, Wisconsin. On August 13, 2008, Michael Winston was arrested as a felon in possession of a firearm. Winston gave police information about Gould's homicide, including that he and Marshall went to North 37th Street to shoot another person but Marshall ended up shooting Gould. At 6:25 a.m. on

Saturday, August 16, 2008, police arrested then-sixteen-year-old Marshall at the home of his grandmother and legal guardian and took him to the Milwaukee Police Administration Building. Dkt. No. 8-9 at 76. After processing, police put Marshall in an interview room at 7:36 a.m. The interview room Marshall was placed in was approximately eight feet by eight feet and furnished with a chair and a table. Dkt. No. 8-8 at 12–13. The walls were cement block, and there was only one small window in the door to the room. The door was locked from the outside, and an armed, uniformed guard was stationed near the door. Between the time he arrived at the Police Administration Building and 9:10 p.m., Marshall was questioned first by one set of detectives and then by another. There were at least four intervals that lasted from minutes to hours throughout the day. Marshall was finally transported to the Milwaukee County Children's Court Center at around 10:30 p.m.

Police detectives Gus Petropoulous and Michael Braunreiter first began interviewing Marshall at 10:45 a.m., more than three hours after Marshall was placed in the interview room, by reading him his *Miranda* rights and asking him if he understood them. When Marshall responded that he understood his rights, Detective Petropoulos asked, "[A]re you now willing to answer questions or make a statement?" Dkt. No. 22-2 at 13:02–03. Marshall answered, "I don't want to make no statement. I'll answer some questions." *Id.* at 13:04–05. Marshall then began answering general background questions.

Over the course of this initial interview, Marshall denied having any knowledge of the murder. He claimed he was at his grandmother's home at the time it occurred. At that point, Detective Petropoulos said that they had already talked to his grandmother and she denied he was home at the time. When Marshall responded that they should call his grandmother and put her on the phone, Detective Petropoulos said they did not need to because they had already talked to her.

Case 1:15-cv-00008-WCG   Filed 04/22/20   Page 2 of 42   Document 45

*Id.* at 53:01–04.  Marshall replied, "Then I ain't going to talk no more." *Id.* at 53:05–06.  Detective

Petropoulos suggested there was no need to bring his grandmother into it and urged that they "[t]ry

to figure this out." *Id.* at 53:07–13.  Marshall responded, "I ain't going to talk no more.  I'm

through talking.  I don't want to talk no more." *Id.* at 53:18–19.  This exchange followed:

> DETECTIVE PETROPOULOS: Well, so you're going to let other people talk for you?
>
> MR. MARSHALL: I'm through talking.  I ain't going to talk no more.
>
> DETECTIVE PETROPOULOS: Well, okay. We'll take a little break then.  You need to use the restroom or anything?
>
> MR. MARSHALL: No.
>
> DETECTIVE PETROPOULOS: Want a cup of water or anything?
>
> MR. MARSHALL: I'm good.
>
> DETECTIVE PETROPOULOS: All right.  You think about things, okay?  And we'll be back in a couple of minutes.  Are you sure you don't need anything?
>
> MR. MARSHALL: I don't need nothing.
>
> DETECTIVE BRAUNREITER: All right.  We'll be right back, okay?
>
> DETECTIVE PETROPOULOS: End of interview at this time.

*Id.* at 53:16–54:06.

At approximately 1:58 p.m., more than two hours after the detectives ended the first

interview, Detectives Braunreiter and Petropoulos returned to the interview room.  Detective

Braunreiter told Marshall that the officer stationed outside the room called them and said that, the

last time he was in the room, Marshall said he wanted to talk to the detectives.  *Id.* at 63:20.

Marshall replied, "Well, yeah.  I asked him what was going on?" *Id.* at 63:21–22.  Detective

Braunreiter stated, "Well, we're trying to track a few things down," and Marshall responded, "Uh

huh (affirmative).  That's what I wanted to ask you-all."  *Id.* at 63:23–26.  The following

conversation ensued:

> DETECTIVE BRAUNREITER: Okay.  Well, just trying to track a few things down, trying to talk to a few more people.
>
> MR. MARSHALL: So are ready to go home today?
>
> DETECTIVE BRAUNREITER: No.  I'm not going to go home today.
>
> MR. MARSHALL: Okay.
>
> DETECTIVE BRAUNREITER: Not at all, okay?  Not unless we - - you know, something remarkable happens, then I don't think that that's going to, okay?
>
> MR. MARSHALL: Okay.
>
> DETECTIVE BRAUNREITER: Feel like talking?
>
> MR. MARSHALL: I got nothing to say.
>
> DETECTIVE BRAUNREITER: Yeah, I can understand that.  We'll just sit in here and give you a little talk.  You don't mind that?  You didn't know yourself, right?  What kind of sports you like?

*Id.* at 63:27–64:16.  Over the next several minutes, the detectives then began discussing various

sports, school, and even the price of gas.  At one point, Marshall asked, "How long am I going to

be up in here, up in this room right here?"  *Id.* at 67:16–17.  Detective Braunreiter replied, "Can't

say for sure how much longer."  *Id.* at 67:18–19.  The conversation soon turned back to small talk,

Marshall's plans for the future, and sports.  After several more minutes, Detective Braunreiter

returned to the subject at hand and the following discussion ensued:

> DETECTIVE BRAUNREITER: I tell you, I know that you said it, that you don't have nothing to say, okay?  But to be truthful with ya, folks always have something to say, okay?  And if you're willing right now, we'd like to talk to ya about what brought you here, but if you haven't noticed already, Gus and I, we ain't into twisting arms and yelling and screaming at folks and that kind of thing.  You know, we don't do that, okay?
>
> MR. MARSHALL: Uh huh (affirmative).

4

DETECTIVE BRAUNREITER: All we try to do is like now, just be civil. Have a nice conversation, try to work some things out. Would you be willing to work some things out with us?

MR. MARSHALL: I just said, I told you-all. I just told you-all, all I know.

DETECTIVE BRAUNREITER: Right. I understand. Like I said, there's some things that we need to try to iron out, try to straighten out, okay? And without you agreeing to talk with us, well, we're not going to—you know, we're not going to waste your time. We're not going to waste our time. You know how that goes. I mean, right?

MR. MARSHALL: Uh huh (affirmative).

DETECTIVE BRAUNREITER: I mean, I know you're sitting in here not much to do and I apologize for that. I wish there was something - - some other way - - where to put ya, you know what I mean? But there ain't, so if we got to talking again, before we get to talking again, I got to read you your rights again. You know what I mean? Those are the rules.

MR. MARSHALL: I know.

DETECTIVE BRAUNREITER: And we're kind of dead set against breaking the rules, okay? Are we wasting our time talking with you?

MR. MARSHALL: Huh uh (negative). No, I just - - I ain't wasting no time. I just told you-all what I knew.

DETECTIVE BRAUNREITER: Well, I know and then without - - you know, at the risk of getting your [sic] irritated again, and that ain't our - - that ain't our design. That ain't what we want, okay? We just want to carry on a conversation with you. We don't want you pissed at us. You know, enough people in the world pissed at us. We don't even want more. You know what I mean?

MR. MARSHALL: Uh huh (affirmative).

DETECTIVE BRAUNREITER: So if you're willing to go over and try to sort some things out, well, we'd probably sit and talk with you and try to sort that out. If you just as soon for now be left alone, well, we'll just leave you alone for now, too. It's your decision, Dario, okay?

MR. MARSHALL: Uh huh (affirmative).

5

DETECTIVE BRAUNREITER: Anyway I know you've got some things on your mind right now. Certainly Gus and I probably ain't high up in your mind. Do you want to have a little conversation with us?

MR. MARSHALL: About what?

DETECTIVE BRAUNREITER: Pretty much the same thing.

MR. MARSHALL: You can talk. I ain't got nothing to say. You can talk to me.

*Id.* at 77:01–79:05.

Detective Braunreiter then re-advised Marshall of his *Miranda* rights, and Marshall responded that he understood those rights. Braunreiter asked, "[r]ealizing that you have these rights, are you now willing to answer questions or make a statement?" *Id.* at 79:25–27. Marshall responded, "I ain't going to make no statement." *Id.* at 80:01–02. Detective Braunreiter said, "Okay. Questions?" to which Marshall responded, "I'll let you-all talk." *Id.* at 80:03–04. Marshall also indicated that he would answer questions if the detectives asked them. *Id.* at 80:05–07.

The detectives proceeded to ask Marshall a wide range of questions about Marshall's relatives and neighbors and why some were saying he was involved in Gould's murder. Marshall continued to deny any knowledge or involvement. At one point, Marshall noted he'd "been up since 7:00 or 6:00 something this morning" and was tired and "ready to go to sleep." *Id.* at 134:13–15. Detective Braunreiter responded that he believed Marshall was tired and that they should "get this done in a hurry then." Braunreiter added that Marshall needed to "look at things the way they are" and that "there's an explanation for this." *Id.* at 134:17–21. Marshall then asked about going to court and whether the detectives had him "on 72 hours." When asked what he meant, Marshall responded, "Yeah, I mean, these discussions, are they 72 hours?" *Id.* at 134:25–135:06. Detective Braunreiter responded "No," and reminded Marshall that he was there on a homicide. Marshall

6

then asked, "I said on the homicide, don't we stay only 72 hours investigation, right?" Braunreiter again responded "no." *Id.* at 135:07–17.

Detective Braunreiter then returned to his interrogation, telling Marshall, "You know, there's a reason why this fellow is putting you out there, okay?" *Id.* at 135:19–20. The detectives continued to insist that Marshall was being set up as the mastermind of the murder and suggested that he could help himself by admitting his involvement. Marshall nevertheless persisted in his denial of any knowledge or involvement of the crime. Shortly before 4:00 p.m., Marshall again stated, "I'm tired, man." *Id.* at 159:15–16. Detective Petropoulos said, "So am I," and Detective Braunreiter chimed in, "We're almost done. We're all tired." *Id.* at 159:17–19. At that point, Marshall said, "I ain't got nothing else to say." *Id.* at 159:20–21. Detective Braunreiter immediately stated, "Okay. You want to take a little break?" and Petropoulos followed with, "Yeah, that's what he said." *Id.* at 159:22–25. Marshall responded, "Huh?" *Id.* at 159:26. After Marshall was asked if he needed to use the restroom and told to finish his soda, Detective Petropoulos announced: "We're pausing the interview. It's approximately 3:55 p.m." *Id.* at 159:27–160:05.

At 4:20 p.m., Marshall asked the guard outside the door if he could talk to Detective Braunreiter alone. When Detective Braunreiter returned to the room, Marshall told the detective that he remembered his rights and did not need them re-read. Marshall then proceeded to tell Detective Braunreiter that he had nothing to do with Gould's murder but that someone he knew was robbed and threatened to kill the person who robbed him. Winston was blaming him for the murder, Marshall claimed, because Marshall won some money from Winston playing dice. *Id.* at 174:21–176:01. When Detective Braunreiter proceeded to tell Marshall why his story was not

Case 1:15-cv-00008-WCG   Filed 04/22/20   Page 7 of 42   Document 45

credible, Marshall offered other explanations why people were claiming he was involved, each of which Detective Braunreiter also rejected. *Id.* at 176:02–182:16.

Shortly thereafter, Detective Braunreiter stated, "I'll spend all night here with you, if that's what you want." *Id.* at 187:11–12. Marshall asked when he would be returned to the Children's Court Center, and Detective Braunreiter responded, "Well, as soon as we're done, okay? It's going to be a little while yet. Now I'll sit in here for as long as you want me to sit in here and talk to ya." *Id.* at 187:15–18. The interview continued, and Marshall asked if Detective Braunreiter could call Marshall's mother. *Id.* at 190:12–16. The detective responded, "No. You've got to understand that you're going to have to help yourself. Being honest and forthcoming is the only thing we ask. It's the only thing that I've ever asked you to do is to tell us truthfully what happened." *Id.* at 190:17–21. Marshall then said, "You need to let me talk to my granny," and Detective Braunreiter responded with a theme he had used earlier and the detectives returned to throughout the interrogation: "Well, I can understand that, okay? The truth, that never changes, Dario. It never changes. Untruth, lies, they change, okay?" *Id.* at 191:03–07. Marshall again asked to call his grandmother, and Detective Braunreiter told him, "Well I can get you a phone to call your granny, sure, but that's got to be after we're done talking, okay? Now I'm here because you wanted to talk with me." *Id.* at 192:05–10.

At this time, Marshall admitted for the first time that he was present during the shooting. He told Detective Braunreiter that Winston had two handguns, a .22 that he kept, and a .357 that he gave Marshall. *Id.* at 195:23–25, 198:14–15. Marshall claimed that Winston asked him to go with him, and when Marshall hesitated, Winston told him he was acting "like a little girl." *Id.* at 198:19–25. At one point, Marshall told Winston he would act as a lookout for him, but then thought to himself that he would only pretend to act as a lookout. *Id.* at 206:16–27. In any event,

8

the two of them drove to an area where Winston parked the car and got out. Marshall said he followed, and after a short period of time, he heard several shots fired. Marshall said Winston "was already shooting and then I seemed like I was shooting at somebody, but I really shot at air. I shot through the air." *Id.* at 194:13–15, 196:09–14. Marshall then said that, when he told Winston, "I think I shot somebody," Winston said, "I shot a dude upon the porch a couple of times." *Id.* at 194:15–18. Marshall said, "I really didn't do no shooting. I didn't even do nothing. I was just pretending like I was playing along." *Id.* at 194:18–19. When asked why this happened, Marshall said that Winston didn't like Mighty. *Id.* at 195:05–06. Throughout the interview, Marshall seemed to shift back and forth between what he knew and what he didn't know, but was persistent in his claim that he was not the shooter. The questioning continued until 5:40 p.m. when Braunreiter left the room to retrieve a photograph and Marshall said he needed to use the restroom. Braunreiter announced the time and said, "we're going to take a break here." *Id.* at 232:13–14.

Detective Braunreiter did not return. He and Petropoulos apparently left for the day, and Detectives Timothy Heier and Matthew Goldberg, who worked the second shift, started their interview with Marshall at approximately 7:41 p.m. Detective Goldberg readvised Marshall of his *Miranda* rights, and Marshall said he understood them. Detective Goldberg then asked Marshall if he wanted to talk to them or make a statement, and Marshall responded, "Uh uh (negative)." *Id.* at 246:03. The detectives immediately ended the interview at 7:45. *Id.* at 246:04. They left the interview room with the recorder and their notes. Dkt. No. 8-8 at 99:19–23. Minutes later, the detectives returned as a "courtesy" to tell Marshall that "we were done" and to explain what would happen next. *Id.* at 99:25–100:2; 102:01–02. During this time, Marshall indicated "he wanted to talk." *Id.* at 100:15–16. The detectives retrieved their notes and recorder, and returned to the

9

interview room at 7:51 p.m. because "Marshall requested to speak with us and we will return for an interview per his request." Dkt. No. 22-2 at 246:05–06.

Before beginning their interview, Detective Goldberg again advised Marshall of his *Miranda* rights, and Marshall again said he would not give a statement, but would answer questions. *Id.* at 248:13–249:1. Marshall ultimately told Detectives Goldberg and Heier that he had accompanied Winston to do a robbery. He said that Winston provided him with a gun and told him to serve as a lookout. When Marshall saw someone on a nearby porch reaching for a gun, he shot his gun in the air towards the porch without shooting at anyone. *Id.* at 276–314. As he had with Detective Braunreiter, Marshall persisted in his denial that he shot Gould despite the detectives' insistence that witnesses apparently stated he did. Marshall finally stated, "Well I'm through. I don't want to talk no more." *Id.* at 314:17–18. The detectives allowed Marshall to call his grandmother. The recording ended at 9:11 p.m. Marshall was transported to the Milwaukee County Children's Court Center at 10:28 p.m.

Marshall was charged with first-degree intentional homicide, as a party to the crime with Winston, and possession of a dangerous weapon by a child. Because of the seriousness of the charge, the case against Marshall started in adult court, and Marshall was ultimately prosecuted as an adult.

**B. Trial Court Proceedings**

Marshall's counsel filed a motion to suppress his statements, claiming that he invoked his right to remain silent but was questioned anyway and that his confession was coerced. The circuit court held a two-day evidentiary hearing on the motion beginning on December 10, 2009. The prosecutor presented as witnesses three of the interviewing detectives and Officer James Thelen, the officer stationed outside Marshall's interview room.

Officer Thelen testified that he "monitor[ed]" Marshall by "sit[ting] outside the door," and "checked" on him "every ten or fifteen minutes to make sure he's okay." Dkt. No. 8-8 at 15. He testified from memory that Detectives Petropoulos and Braunreiter interviewed Marshall. At some point, they left to go out and do some follow-up. Sometime later (Officer Thelen did not know how much later), Marshall asked to talk to both detectives again. Officer Thelen notified someone at the Detective Bureau, who notified the detectives, and they returned to talk to Marshall. *Id.* at 15:23–17:04. Officer Thelen further testified that, "shortly after" the detectives spoke with Marshall the second time, they left, and about 20 minutes later, Marshall asked to speak directly to Detective Braunreiter only. Officer Thelen informed Detective Braunreiter of Marshall's request. *Id.* at 18:13–23.

On cross-examination, Officer Thelen was asked if Marshall said what he wanted the detectives to do when he asked to talk with them. Officer Thelen replied: "I believe he said, hey, I want to talk to him again, can you get him?" *Id.* at 24:06–16. Thelen was then asked, "Did he ever ask you, hey, I want to know what's going on?", to which he responded, "Not to my recollection, no." At the same time, Thelen acknowledged that the interview occurred some months earlier. *Id.* at 24:14–19.

Detectives Braunreiter and Petropoulos both described the series of interviews they conducted. Detective Braunreiter was asked why he and Detective Petropoulos ended the initial interrogation of Marshall:

Q: Why did the interview end?

A: Ladarius Marshall didn't want to talk to us any more.

Q: He said words to you that you understood to mean that he did not want to talk to you any more?

A: Yes, sir.

Q: So you terminated the interview?

A: That's correct, sir.

Q: As far as you were concerned, at that time the interview was done?

A: Yes.

*Id.* at 52:16–53:01. Detective Braunreiter testified that he and Detective Petropoulos left the building after the initial interview ended, but returned when they received word that Marshall wanted to speak to them again. *Id.* at 53:24–54:02. On cross-examination, Detective Braunreiter testified as follows:

Q: You told Mr. Marshall during the second interview that the officer outside there, he called us, he said the last time he was in here you said you wanted to talk to us? And Mr. Marshall said, yeah, I just wanted to find out what was going on, right?

A: I believe that's how it went, yes.

Q: And then you told Mr. Marshall, well, we are trying to track a few things down, and Mr. Marshall responded ug ug [sic], that's what I wanted to ask you all. Is that right?

A: I believe that's how it went, yes, ma'am.

Q: And Mr. Marshall did not say to you I want to talk to you about the homicide of Lavare Gould at that point in time; is that correct?

A: That's correct.

Q: In fact, when you said do you feel like talking, Mr. Marshall said I got nothing to say; is that true?

A: I believe that's what he said, yes.

Q: And then you went on and talked about sports for a while, and then you read him his rights again; is that right?

A: Yes, ma'am.

Q: And Mr. Marshall told you after you read him the rights, quote, I ain't going to make no statement; is that correct?

12

A: I believe he didn't want to make a statement again, yes.

Q: And then he said you all can talk; is that right?

A: I believe that's what he said, yes.

Q: But you continued to question him even after he said I ain't going to make a statement?

A: Well, we continued to question him after he told us that we could talk.

. . .

Q: And after two hours he ended the interview; is that correct?

A: I believe it was just a little bit, but two hours is--yes.

*Id.* at 82:04–84:02. Detective Braunreiter denied that either he or Detective Petropoulos had threatened Marshall in the course of the interviews. *Id.* at 51. At various times, Marshall was offered food and drink, and was provided a McDonalds hamburger and fries, along with a soda for lunch. *Id.* at 91:20–92:06. Detective Petropoulos' testimony essentially mirrored that of Detective Braunreiter. Dkt. No. 8-9 at 27–33.

Detective Timothy Heier, one of the detectives who continued with the interrogation after Detectives Braunreiter and Petropoulos left at the end of their shift, also testified. Detective Heier testified that when he first entered the interview room for what was the fourth interview, Marshall said "he wanted to make a phone call and talk [t]o his grandma." Dkt. No. 8-8 at 96:12–13. Detective Heier and his partner then took Marshall into the hallway where there was a phone on the wall and attempted to place the call, but there was no answer. Heier then told Marshall they "would try again later." *Id.* at 96:14–22. After the attempted phone call, they went to a different interview room, left the door open, read Marshall his *Miranda* rights, and asked Marshall if he

13

wanted to make a statement. When Marshall said no, the detectives "stopped and noted the time at 7:45 p.m. and left the room." *Id.* at 97:17–99:23.

Detectives Heier then testified about how he and Goldberg returned to tell Marshall the next step, but Marshall seemed surprised that they had left and indicated he was willing to continue talking to them. *Id.* at 99:25–103:16. After the detectives advised Marshall of his *Miranda* rights for the second time, Marshall told them that he understood them and that he would talk to them, but he did not want to make a statement. Detective Heier explained to him that talking is making a statement, that it's the same thing, and asked Marshall what he wanted to do. Marshall stated that he would talk to the detectives. *Id.* at 102:07–103:16.

Detective Heier testified that there were no threats or promises, anything that would force Marshall into waiving his rights and that Marshall was not handcuffed at any time during the interview. Marshall conveyed to the detectives that "this was totally something that he wanted to do. Dkt. No. 8-9 at 17:06–07. At 9:01 p.m., Marshall told the detectives that he wanted to again make that attempt to call his grandma. They took him to the phone, and allowed him to make somewhere around 7 or 8 different calls. Marshall talked for ten minutes in an attempt to contact various family members, but apparently without success. Dkt. No. 8-8 at 105:12–106:22. Shortly thereafter, Marshall was transported to the Milwaukee County juvenile facility.

Marshall did not testify at the evidentiary hearing. His mother and grandmother both testified that they called the police station to try to get information but were not given any. His mother testified that Marshall was in "special aid class" at school because he has "retardation," and his grandmother testified that she was his legal guardian and that Marshall has "mild retardation." *State v. Marshall*, 2013 WI App 105, ¶ 16, 349 Wis. 2d 787, 837 N.W.2d 177. Marshall's grandmother testified that she "most definitely" would have been present during

questioning if given the opportunity. *Id.* Psychologist Deborah Collins, who had completed a "forensic evaluation" of Marshall, testified that Marshall "'functions somewhat . . . above the range of mild mental retardation,' that 'his cognitive limitations' at school are due to 'problems in school adjustment, behavioral issues,' 'cannabis abuse,' and that '[h]e hadn't been identified . . . with mild mental retardation, and if that were the case, the school setting would have most likely identified that.'" *Id.* at ¶ 17.

The parties thereupon rested without moving for admission of the transcripts or the audio recordings of the interviews. Dkt. No. 8-9 at 67:23–68:03. In an oral ruling from the bench, the circuit court denied the motion to suppress, concluding that Marshall's rights under *Miranda* had not been violated and that his statement was voluntary. The court noted that, at the time of the crime, Marshall "was functioning at a somewhat higher than borderline intellectual capacity. He had not had any identification of mental retardation. He had some cognitive limitations, but . . . higher than the borderline intellectual functioning, as Dr. Collins has described." Dkt. No. 8-9 at 89:23–90:03. Although Marshall "had academic delays," those delays "went beyond his cognitive abilities and included behavioral issues, things such as cannabis abuse." *Id.* at 90:04–09. The trial court then summarized the facts and concluded that Marshall "was properly advised of his constitutional rights at all points before any questioning by the officers" and that "he did knowingly and voluntarily waive those rights." *Id.* at 98:21–25. The court observed that, "[i]n each of the situations he did decide to, in fact, talk with the officers, to answer questions. Although, again, he was choosing not to make any formal statement, he was willing to answer the questions the officers were making." *Id.* at 98:25–99:04. The court concluded that Marshall "was proceeding voluntarily and was responding with answers that were, in fact, the product of a free and unconstrained will, reflecting a deliberateness of choice as opposed to the result of a conspicuously equal

confrontation." *Id.* at 99:08–13. The court also found that Marshall was not "the subject of 16 hours of non-stop interrogation" and instead observed that "[t]here were several interrogations . . . stopped at [Marshall's] request" and "then reinitiated" by Marshall. *Id.* at 99:22–100:02. Based on the evidence before it, the circuit court found:

> the defendant did not invoke a right to remain silent. That when the officers wanted to start talking to him, that when he did decide to terminate any interviews, the officers meticulously complied with that. That the interrogations were resumed after the defendant terminated them at his own request. That there was nothing coercive about the procedures. The duration that he was in custody was not coercive in any way, and as I look at all of the totality of the circumstances, even considering that he's 16 years and 3 months, I'm going to find that the statements were in compliance with constitutional rights and that the defendant made the statements freely and voluntarily.

*Id.* at 101:12–102:03. The court then denied the motion to suppress the statements.

On March 8, 2010, Marshall pled guilty to amended charges of second-degree reckless homicide as party to a crime, with the use of a dangerous weapon, and possession of a dangerous weapon by a person under the age of 18. On May 24, 2010, the circuit court sentenced Marshall to 30 years of imprisonment on the homicide count, with 20 years of initial confinement and 10 years of extended supervision, and nine months concurrent on the weapon charge.

### C. Marshall's Direct Appeal

Marshall appealed the circuit court's denial of his motion to suppress his statements. He asserted that he invoked his right to remain silent and that his statements were involuntary. The Wisconsin Court of Appeals affirmed, finding that the record supported the trial court's determinations. The court of appeals' analysis regarding whether the detectives violated Marshall's right to remain silent consists of two paragraphs. First, the court summarized the state law equivalent of the federal standards governing a suspect's invocation of his right to remain silent:

A suspect's right to remain silent includes both the initial right to remain silent and the right to cut off questioning. *State v. Markwardt*, 2007 WI App 242, ¶ 24, 306 Wis. 2d 420, 434, 742 N.W.2d 546, 553. If the right is unequivocally asserted, police must "scrupulously honor" a suspect's decision to "cut off questioning." *Id.*, 2007 WI App 242, ¶¶ 24, 26, 306 Wis. 2d at 434–435, 742 N.W.2d at 553–554. Police do not need to stop questioning if they reasonably believe the suspect's statement is ambiguous. *Id.*, 2007 WI App 242, ¶ 28, 306 Wis. 2d at 435–536, 742 N.W.2d at 554. Further, questioning can start again if the suspect re-initiates communication with police. *See Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S. Ct. 1880, 68 L.Ed.2d 378 (1981).

*Marshall*, 349 Wis. 2d 787, ¶ 20. Applying that law, the court of appeals affirmed the trial court's findings:

> The circuit court found that Marshall never unequivocally and unambiguously invoked his right to remain silent. The Record supports the circuit court's finding. Although Marshall said he would not make a statement, he agreed to answer questions. Detectives Petropoulos and Braunreiter reasonably interpreted this to mean that Marshall would talk to them in a question and answer format but would not give a narrative. When Marshall told them that he was done talking, the detectives left and did not return until Marshall asked for them. They stopped when Marshall said he had nothing more to say. Marshall then resumed the interviews by asking to talk to Braunreiter alone. That interview ended, not because Marshall said he wanted to stop talking, but because he said he needed to use the restroom. When detectives Heier and Goldberg took over after the shift change, they left the room when Marshall said he would not make a statement. Then, they came back only to tell Marshall that they were moving on to the next step in processing. He responded by saying he wanted to talk to them more.

*Id.* at ¶ 21. The Wisconsin Court of Appeals also concluded that the trial court's finding that Marshall's statements were voluntary was supported by the record. *Id.* at ¶¶ 22–25. The court ultimately affirmed Marshall's conviction. *Id.* at ¶ 26.

Marshall petitioned the Wisconsin Supreme Court for review. The Court denied his request on January 13, 2014. He subsequently filed his habeas petition in this court.

## D. Proceedings in District Court

This court's consideration of Marshall's petition was delayed by confusion over the contents of the record in the state court proceedings. After the initial briefing on the petition was

complete, the court realized that neither the audio recording nor the transcript of Marshall's interrogation, upon which his arguments relied, was filed by the Respondent as part of his answer to the petition. On May 17, 2016, the court ordered the Respondent to supplement the record with the transcript and/or audio recording and, upon a finding that it would further the interests of justice, appointed counsel to represent Marshall in the case pursuant to 18 U.S.C. § 3006A(a)(2). On June 10, 2016, the Respondent filed with the court the CDs containing recordings of Marshall's interviews with the detectives and a transcript of the recordings. Dkt. No. 22. However, in a supplemental brief in opposition to the petition filed on November 30, 2016, the Respondent noted the neither the transcripts nor the recordings were admitted into evidence by the circuit court. Respondent argued that, "because the Milwaukee County Circuit Court did not rely on the transcripts when making its findings of fact, this Court cannot consider either the defense-prepared transcripts of Marshall's interviews or the audio files." Dkt. No. 29 at 3.

After a brief hearing on the issue, the attorney for Marshall filed an unopposed motion to stay the case in this court so that Marshall could file a motion for postconviction relief and exhaust his state court remedies on the claim that his attorney in his state case was ineffective in failing to properly authenticate the transcripts and/or move for admission of the audio recordings of the police interviews of her client. The court granted the unopposed motion on January 10, 2017, and the case returned to state court. Dkt. Nos. 32, 33.

Back in the state court system, the circuit court denied Marshall's motion for postconviction relief without a hearing, and the Wisconsin Court of Appeals affirmed. Dkt. No. 40. In affirming the circuit court's order denying Marshall's motion, the Court of Appeals noted that, although the transcripts of Marshall's interviews had not been admitted into evidence, they were included in the appellate record and had been considered by the court in affirming Marshall's

conviction on his direct appeal. The court stated "Our decision on direct appeal shows that we examined the interview transcripts and extensively quoted from them concerning Marshall's interactions with the detectives." Dkt. No. 40-1 at 4. The court then concluded that its determination that the record on appeal supported the denial of Marshall's suppression motion was the law of the case, and under the law of the case doctrine, Marshall was precluded from relitigating the issue. The Wisconsin Supreme Court denied review on July 10, 2019, and Marshall's motion to lift this court's stay was filed on August 6, 2019. This court granted Marshall's motion the following day and heard argument on October 11, 2019.

## ANALYSIS

### A. Standard of Review

Marshall's petition for federal relief is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Under AEDPA, a federal court may grant habeas relief only when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" decisions from the United States Supreme Court, or was "based on an unreasonable application of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315–16 (2015). A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite result as the Supreme Court on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision is an "unreasonable application of . . . clearly established federal law" when the court applied Supreme Court precedent in "an objectively unreasonable manner." *Id.*

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" when it is so clearly incorrect that it would

not be debatable among reasonable jurists. *Brumfield v. Cain*, 576 U.S. 305, 135 S. Ct. 2269, 2277 (2015) ("If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." (internal quotations and brackets omitted)). The determination of a factual matter made by a state court is presumed to be correct, and that presumption can be overcome only by clear and convincing evidence. § 2254(e)(1); *Janusiak v. Cooper*, 937 F.3d 880, 888 (7th Cir. 2019) ("The petitioner must show by clear and convincing evidence that the findings were unreasonable."). Although habeas courts cannot "second-guess the reasonable decisions of state courts," *Renico v. Lett*, 559 U.S. 766, 779 (2010), "deference does not imply abandonment of or abdication of judicial review . . . ." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) ("[A] decision involves an unreasonable determination of facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.").

This is, and was meant to be, an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Marshall asserted two separate claims in his § 2254 petition for federal relief: (1) that his self-incriminating statements were obtained in violation of his *Miranda* rights; and (2) that his incriminating statements were not voluntary. Because the court concludes that Marshall is entitled to relief on his *Miranda* claim, it is unnecessary to decide whether he is entitled to relief on his claim that his statements were involuntary.

20

### B. Miranda Violation

Marshall first argues that the Wisconsin state courts unreasonably applied *Miranda* and its progeny in denying his motion to suppress. He claims that Detectives Braunreiter and Petropoulos began the second interrogation and continued to question him after he invoked his right to remain silent in the first interview and thereby failed to "scrupulously honor" his invocation of his right to remain silent, as *Miranda* requires. The continued questioning after he unequivocally invoked his right, Marshall contends, constitutes a violation of clearly established federal law and mandates relief under § 2254.

### 1. Clearly established federal law governing *Miranda*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." To protect the right against self-incrimination, the Supreme Court has established procedural safeguards requiring law enforcement to advise a person of the Fifth Amendment right prior to any custodial interrogation. *See Miranda*, 384 U.S. at 468–77. In particular, the *Miranda* Court held that, before the start of a custodial interrogation, law enforcement must advise the person of his right to remain silent, that any statements he makes can be used as evidence against him, and that he has the right to the advice of an attorney during questioning, whether he can afford to hire his own or not. *Id.* at 479. *Miranda* held not only that an accused must be advised of his right to remain silent, but also "assure[d] a continuous opportunity to exercise it." *Id.* at 444. In other words, a person subjected to a custodial interrogation must be told that he can cut off questioning at any time. "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445. "Without the right to cut off questioning,"

the Court held, "the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Id.* at 474.

*Miranda* also set stringent standards for waiver of the new rights it was creating: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475. The Court offered several examples of what would or would not meet that "heavy burden" of showing waiver:

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.
>
> . . .
>
> Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated.

*Id.* at 475–76.

Notwithstanding this language, the Court has since made clear that "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979). In *Butler*, a written form was used to advise the defendant of his *Miranda* rights, but he refused to sign the waiver at the bottom of the form. He was told that he didn't have to speak or sign the form, but that the agents would like him to talk to them. The respondent replied: "I will talk to you but I am not signing any form." He then made inculpatory statements, which the North Carolina Supreme Court found inadmissible because an explicit

waiver of his rights was not shown. *Id.* at 371–72. The Court reversed, rejecting the per se rule requiring an express written or oral statement of waiver and instead explaining that the issue of waiver was to be determined by the totality of circumstances: "the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 374–75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). More recently, the Court has held that a suspect can waive his right to remain silent under *Miranda* by simply responding to questions by an interrogating officer after being fully advised of his rights. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010).

The Court had also suggested in *Miranda* that a suspect's invocation of his right to remain silent or to counsel did not have to be perfectly clear in order to cut off questioning: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473–74. On this issue, as well, however, the Court has clarified its initial holding. More recent cases have held that the invocation of either the right to counsel or the right to remain silent at a custodial interrogation must be unequivocal. *See Thompkins*, 560 U.S. at 381–82; *Davis v. United States*, 512 U.S. 452 (1994). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." *Thompkins*, 560 U.S. at 381 (quoting *Davis*, 512 U.S. at 461–62). *Thompkins* held that the same rule applies to the right to remain silent.

*Michigan v. Mosley*, 423 U.S. 96 (1975), is especially pertinent to this case. There, the Supreme Court rejected the suggestion that a suspect's invocation of his right to remain silent results in "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances." *Id.* at 102. In *Mosley*, the

defendant was advised of his *Miranda* rights by a detective investigating a series of robberies. The defendant stated that he did not want to discuss the robberies, and the detective immediately ceased the interrogation. After an interval of more than two hours, another police officer at another location sought to question the defendant about an unrelated holdup murder. The defendant was again given *Miranda* warnings, but this time waived his rights and gave an incriminating statement.

In holding that the resulting statement was admissible, the Court noted that *Miranda*'s instructions to law enforcement officers that interrogation must cease when a person in custody indicates that he wishes to remain silent did not state under what circumstances, if any, a resumption of questioning is permissible. The Court recognized that the passage could be read in several ways:

> The passage could be literally read to mean that a person who has invoked his "right to silence" can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize "any statement taken after the person invokes his privilege" as "the product of compulsion" and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.

*Id.* at 101–02. The Court noted that any of these proposed interpretations would lead to absurd and unintended results. On the one hand, "to permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.* at 102. "At the other extreme," the Court noted, "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative

24

activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Id.* The Court therefore rejected an interpretation which would create "a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03. The Court instead concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 103.

Applying that principle to the facts of the case before it, the Court noted that this was not a case "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105–06. "In contrast to such practices," the Court observed, "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106. Based on these facts, the Court held that the statement was admissible.

In *Arizona v. Edwards*, the Court held that once an accused invokes his right to counsel in a custodial interrogation, the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85 (1981). Although *Edwards* dealt with an accused's right to counsel under *Miranda*, as opposed to the accused's right to remain silent, the Court has noted that "much of the logic and language of the opinion could be applied to the invocation of the former." *Solem v. Stumes*, 465 U.S. 638, 648

(1984); *see also Berghuis*, 560 U.S. at 381 (noting that "there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel . . . ."). It thus follows that as long as police "scrupulously honor" an accused's invocation of his right to remain silent, questioning can lawfully continue if "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485.

In *Oregon v. Bradshaw*, a plurality of the Court held that a suspect initiates further communication when he "evince[s] a willingness and a desire for a generalized discussion about the investigation." 462 U.S. 1039, 1045–46 (1983). Yet, the same plurality also recognized that "there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue." *Id.* at 1045. By way of examples, the plurality noted that "there are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* These types of "inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship," the plurality noted, "will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Id.*

Finally, in *Fare v. Michael C.*, 442 U.S. 707 (1979), the Court made clear that, while the general rules surrounding the implementation of *Miranda*'s safeguards apply equally to juveniles, the fact that the person subjected to a custodial interview is a juvenile is one of the circumstances that must be considered in deciding whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel:

> This totality-of-the-circumstances approach is adequate to determine whether there
> has been a waiver even where interrogation of juveniles is involved. We discern no

26

> persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *See North Carolina v. Butler*, *supra*.

*Id.* at 725; *see also J. D. B. v. North Carolina*, 564 U.S. 261, 265 (2011) (holding that "a child's age properly informs the Miranda custody analysis").

### 2. Application of clearly established law to facts of case

#### a. Petropoulos/Braunreiter interrogation

There is no dispute that Detectives Petropoulos and Braunreiter properly advised Marshall of his *Miranda* rights before the first interview began. There is also no dispute that Marshall initially waived his rights and agreed to answer questions. Marshall's response that he would not give a statement but that he would answer the detectives' questions constitutes a waiver of his right to remain silent. As the circuit court noted, Marshall apparently drew a distinction between making a statement and answering questions, and while he clearly told the detectives that he did not want to give them a formal statement, he was willing to have a discussion with them and answer at least some of their questions. Dkt. No. 8-9 at 95:16–20. No more is required. *Butler*, 441 U.S. at 373.

Contrary to the conclusion of the state courts, however, it is also clear that Marshall subsequently invoked his right to cut off questioning. When Detective Petropoulos refused Marshall's request that they telephone his grandmother to confirm his claim that he was at her home at the time of the shooting, Marshall replied, "Then I ain't going to talk no more." Dkt. No. 22-2 at 53:05–06. When Detective Petropoulos suggested there was no need to bring his grandmother into it and urged that they "[t]ry to figure this out," Marshall repeated: "I ain't going to talk no more. I'm through talking. I don't want to talk no more." *Id.* at 53:07–19.

27

Here, it is important to note that Marshall was no longer merely saying he would not give a "statement;" he was saying unequivocally that he would no longer talk to the detectives, that he "was through talking." Detective Braunreiter admitted as much at the hearing on Marshall's motion to suppress. When asked why the first interview ended, Detective Braunreiter replied, "Ladarius Marshall didn't want to talk to us any more." Dkt. No. 8-8 at 52:17–18. Detective Braunreiter then acknowledged that at that time Marshall "said words to [Braunreiter] that [Braunreiter] understood to mean that [Marshall] did not want to talk to [him] any more." *Id.* at 53:19–21. It was for this reason, Detective Braunreiter testified, that they terminated the interview and that, as far as they were concerned, "at that time the interview was done." *Id.* at 52:22–53:01.

But instead of "scrupulously honoring" Marshall's invocation of his right to cut off questioning, Detective Petropoulos attempted to change his mind by asking him, "so you're going to let other people talk for you?" Dkt. No. 22-2 at 53:16–17. When Marshall persisted, saying, "I'm through talking. I ain't going to talk no more," *id.* at 53:18–19, the detectives tried to suggest that, rather than cutting off further questioning, Marshall was simply asking for a break. Detective Petropoulos said, "Well, okay; We'll take a little break then;" and proceeded to offer Marshall the use of the restroom or something to drink. *Id.* at 53:20–25. When Marshall declined, Detective Petropoulos said, "All right. You think about things, okay? And we'll be back in a couple of minutes." *Id.* at 53:27–54:02. Detective Braunreiter added, "All right. We'll be right back, okay?" and Detective Petropoulos announced, "End of interview at this time." *Id.* at 54:03–06.

This evidence reveals unmistakably that Marshall attempted to cut off further questioning and thereby invoke his right to remain silent. Despite this undisputed evidence, the circuit court found that "the defendant did not invoke a right to remain silent," and that "when he did decide to terminate any interviews, the officers meticulously complied with that." Dkt. No. 8-9 at 101:13–

28

18. The Wisconsin Court of Appeals affirmed, stating that "[t]he circuit court found that Marshall never unequivocally and unambiguously invoked his right to remain silent," and stated that "[t]he Record supports the circuit court's finding." 349 Wis. 2d 787, ¶ 21. At most, though, the record supports only the finding that Marshall did not *initially* invoke his right to remain silent. He clearly and unequivocally invoked his right to cut off questioning, as Detective Braunreiter acknowledged in his testimony. And as both *Miranda* and *Mosley* make clear, the invocation of the right to cut off questioning, which is really but a corollary of the right to remain silent, must also be scrupulously honored. *See Mosley*, 423 U.S. at 103 ("We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (quoting *Miranda*, 384 U.S. at 474, 479)).

The failure of Detectives Petropoulos and Braunreiter to scrupulously honor Marshall's invocation of his right to cut off questioning before the break continued when they returned. As noted above, even if a suspect invokes his rights under *Miranda*, police are free to resume questioning if "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485. And as also noted above, a suspect initiates further communication when he "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46. That is what the state courts found that Marshall did here. After sitting by himself, locked in the eight-by-eight foot, windowless interview room, for almost two hours, Marshall knocked on the door. Although the transcript of the interviews suggests that Marshall simply wanted to know what was going on, Officer Thelen testified at the suppression hearing, and the circuit court found, that Marshall asked if he could talk to the two detectives again. Dkt. No. 8-8 at 16:23–17:04. This is sufficient to support the state

29

courts' conclusion that Marshall initiated further discussion. But, unfortunately, Detectives Braunreiter and Petropoulos continued the same approach after the break that they had used before when Marshall first attempted to cut off questioning.

Recall that upon reentering the interview room after the break, Detective Braunreiter told Marshall that the officer outside told them that Marshall wanted to talk to the detectives. Dkt. No. 22-2 at 63:20. Marshall replied, "Well, yeah. I asked him what was going on?" *Id.* at 63:21–22. Detective Braunreiter stated, "Well, we're trying to track a few things down," and Marshall responded, "Uh huh (affirmative). That's what I wanted to ask you-all." *Id.* at 63:23–26. At that point, Marshall asked about going home, and Detective Braunreiter responded that he, Detective Braunreiter, was not planning on going home unless something remarkable happened. Detective Braunreiter then asked Marshall, "Feel like talking?" Marshall responded, "I got nothing to say," to which Detective Braunreiter replied: "Yeah, I can understand that. We'll just sit in here and give you a little talk. You don't mind that? You didn't know yourself, right? What kind of sports you like?" *Id.* at 64:03–16.

Here, again, Marshall was invoking his right to remain silent. Absent greater maturity and a much stronger educational background than Marshall had, it is difficult to imagine how he could have more clearly conveyed to the detectives that he did not want to talk to them. "Concluding that [Marshall's] statement was ambiguous and equivocal would suggest that a suspect never invokes his right to silence unless he intones some sort of talismanic phrase, such as 'I invoke my right to silence under the Fifth Amendment.'" *Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2005). The fact that the detectives immediately changed the subject surely demonstrates that they understood that Marshall was unwilling to talk to them about the murder they were investigating.

30

In an obvious attempt to nevertheless continue questioning Marshall, the detectives proceeded to engage Marshall in small talk about various other matters until several minutes later when Detective Braunreiter said:

> I tell you, I know that you said it, that you don't have nothing to say, okay? But to be truthful with ya, folks always have something to say, okay? And if you're willing right now, we'd like to talk to ya about what brought you here, but if you haven't noticed already, Gus and I, we ain't into twisting arms and yelling and screaming at folks and that kind of thing. You know, we don't do that, okay?

Dkt. No. 22-2 at 77:01–08. Marshall gave an affirmative response, and Detective Braunreiter then continued: "All we try to do is like now, just be civil. Have a nice conversation, try to work some things out. Would you be willing to work some things out with us?" to which Marshall replied, "I just said, I told you-all. I just told you-all, all I know." *Id.* at 77:10–15. Detective Braunreiter continued, telling Marshall that, while the detectives did not want to waste either their time or his, there were some things that they needed to "try to iron out, try to straighten out" and that without Marshall agreeing to talk with them, they would be unable to do so. *Id.* at 77:16–21. Detective Braunreiter then acknowledged that Marshall had been sitting in the interview room with "not much to do" and apologized for that, while at the same time telling him that there was no alternative. And because there was no alternative, Detective Braunreiter explained that "the rules" required that he read Marshall his rights again in case and before "we get talking again." *Id.* at 77:23–78:02. Because they were "kind of dead set against breaking the rules," Detective Braunreiter told Marshall that he would again "read him his rights." *Id.* at 78:04–05.

But before he did so, Detective Braunreiter asked Marshall, "Are we wasting our time talking with you?" *Id.* at 78:05–06. Marshall replied: "No, I just - - I ain't wasting no time. I just told you-all what I knew." *Id.* at 78:07–08. Detective Braunreiter then told Marshall that he did not want to irritate him, but simply wanted "to carry on a conversation with you." *Id.* at 78:09–

15. At the same time, Detective Braunreiter suggested that Marshall would remain in the interview room until he answered their questions. He told Marshall that if he was "willing to go over and try to sort some things out, well, we'd probably sit and talk with you and try to sort that out." On the other hand, Detective Braunreiter explained, "If you just as soon for now be left alone, well, we'll just leave you alone for now, too." "It's your decision," the detective said. *Id.* at 78:17–21.

Having explained the situation and noting he was sure Marshall had some things on his mind, Detective Braunreiter again asked Marshall, "Do you want to have a little conversation with us?" Marshall then asked, "About what?" and Detective Braunreiter answered, "Pretty much the same thing." At that point, Marshall responded, "I ain't got nothing to say. You can talk to me." *Id.* at 78:23–79:05. Detective Braunreiter then re-advised Marshall of his *Miranda* rights, and Marshall again stated he understood those rights and that he would not make a statement but that the detective could talk to him and he would answer questions. *Id.* at 79:25–80:07.

Here, again, we have a violation of clearly established federal law. The "rigid" rule requiring all questioning to cease upon a suspect's invocation of his right to remain silent "is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Davis*, 512 U.S. at 458 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). As the Court explained in *Mosley*, "to permit the continuation of custodial interrogation [of a suspect who has invoked his right to remain silent] after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." 423 U.S. at 102. Police do not scrupulously honor an accused's invocation of his right to remain silent by first diverting the accused with small talk and then trying to convince him to change his mind and answer questions. Yet, that is what the audio recordings of their interviews of Marshall show that Detectives Braunreiter and Petropoulos did

32

here. This is quite simply a case "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 U.S. at 105–06.

The tactics used by Detectives Braunreiter and Petropoulos stand in stark contrast to the way Detectives Goldberg and Heier addressed Marshall's invocation of his right to remain silent when they took over the interrogation after the shift change. After letting Marshall attempt to telephone his grandmother, Detective Goldberg readvised Marshall of his *Miranda* rights and asked Marshall if he wanted to talk to them or make a statement. When Marshall responded in the negative, Detectives Goldberg and Heier immediately ended the interview and left the interview room with their recorder and notes. Dkt. No. 22-2 at 245:07–246:04; Dkt. No. 8-8 at 98:18–99:23. Detectives Braunreiter and Petropoulos, in contrast, continued talking to Marshall until he agreed to answer their questions. Not surprisingly, he eventually did.

The fact that Marshall asked to talk to Detective Braunreiter alone before he made any incriminating statements does not change the analysis. By that time, Detectives Braunreiter and Petropoulos had made clear to Marshall that he wasn't going anywhere until he answered all their questions. They had repeatedly ignored his invocation of his right to stop answering their questions first by treating his statements that he had nothing to say to them as requests for breaks and then talking him into changing his mind. Under these circumstances, Marshall's request to talk to Braunreiter alone cannot be reasonably viewed as his initiation of further discussion after a previous interview had ended. As a matter of fact, the previous interview had not ended. Although Marshall had again told the detectives that he was tired and "had nothing else to say," the detectives immediately misstated what he had said. Detective Braunreiter quickly responded, "Okay. You

33

want to take a little break?" and Petropoulos followed with, "Yeah, that's what he said." *Id.* at 59:15–25. Just before they stopped the recording, Detective Petropoulos announced: "We're pausing the interview. It's approximately 3:55 p.m." *Id.* at 159:27–160:05. Thus, by the detectives' own account, the interview had not ended, but only paused for a break. Marshall's request to talk to Detective Braunreiter alone under these circumstances was thus not an initiation of questioning by Marshall after an interview had ended, but an attempt to limit the ongoing interview after the break to only Detective Braunreiter.

It follows that the statements Marshall made to Detectives Braunreiter and Petropoulos after his first invocation of his right to remain silent were inadmissible. The state courts' conclusions that Detectives Braunreiter and Petropoulos fully complied with *Miranda* are contrary to the clearly established federal law set forth by the Court in *Michigan v. Mosley*. There remains, however, the question whether statements Marshall made to Detectives Goldberg and Heier were admissible.

### b. Goldberg/Heier interrogation

As noted above, Detectives Goldberg and Heier took over for Detectives Braunreiter and Petropoulos when they left for the day and met with Marshall at approximately 7:40 p.m., some two hours after Detective Braunreiter had stopped questioning him. After they unsuccessfully attempted to place a call to Marshall's grandmother, the detectives placed Marshall in a different but similar interview room and advised him of his *Miranda* rights. When Marshall responded negatively to the question whether he was willing to waive his rights and answer their questions, they immediately shut off the recorder, picked up their notes and left the interview room. But shortly after that, Marshall asked to speak to them, and they returned to the interview room. Dkt. No. 22-2 at 245:07–246:09. The transcript of the interview reflects that, upon their return,

Detectives Goldberg and Heier made abundantly clear to Marshall that he did not have to talk to them.

After first confirming with Marshall that he was now asking to speak to them, Detective Heier, who apparently took the lead, told Marshall that they would again advise him of his rights, even though they had just done so moments earlier. Detective Heier explained why:

> Okay. And what we do when people ask to talk to us again because we play fair and we play by the book. We do this all the time. Okay? We always read the rights again, a second time because we want to make sure if you have any questions, you know, you ask us and let us know. Okay? Because what I want you to realize is, you're in charge here. Okay? We do what you want to do. Okay? We're not going to make you say anything or do anything you don't want to do, Okay?

*Id.* at 246:10–18 (apostrophes omitted in transcript added). In response to the detectives' questions, Marshall then confirmed that no one had threatened him or promised him anything to get him to talk with them, and that he really wanted to talk to them. *Id.* at 246:19–24 ("[T]hat's something you want. Is that correct."). Detective Heier then told Marshall what would happen next, again making sure he knew the importance of his decision:

> He's [Detective Goldberg] going to ask you this and if you have any questions and – he's going to read it to you because, like I said, we, we want to do this fair. We want to make sure you understand everything. Okay? And this is obviously because this is a homicide, I want to make sure that we answer all your questions. That you are fully aware, aware of what's going on. This is a big investigation. This is something that's going to affect you and I want to make sure that you're informed. Okay? You understand that?

*Id.* at 247:01–09. Marshall indicated he understood, but Heier continued to explain further:

> Okay. But we're, we're not going to make you do anything you don't want to do. We're not going to yell at you. We're not going to threaten you. We're, we're, you know, this is, this is something that we want to make sure this is something you want to do. Okay? Yes?

*Id.* at 247:11–15. Only when Marshall responded "Got it" did Goldberg proceed to advise him once again of his *Miranda* rights. *Id.* at 247:19–248:06.

35

When Detective Goldberg finished reading the rights card, Marshall was again asked if he understood them. He answered "yes" and was then asked, "Okay. Now realizing you have these rights, are you now willing to answer questions or make a statement?" *Id.* at 247:07–11. Marshall's response appears in the transcript as "[Indecipherable]", but one of the detectives immediately asked him, "You don't want to make a statement?" Marshall responded, "No, I'll talk to you all, but I'm not making no statement." One of the detectives replied, "Oh. That's what talking to us is, is just making a statement. You want to talk?" Marshall answered, "Yeah I'll talk." But reiterated "no statement." *Id.* at 248:12–19. Satisfied that Marshall fully understood his rights and voluntarily waived them, only then did Detectives Heier and Goldberg proceed to question him.

After first covering general background information, the detectives turned to the murder investigation, asking, "Now, you talked to the other detectives about this?" *Id.* at 258:24. Detective Heier then explained to Marshall that he and Detective Goldberg were among the first on the scene to question witnesses. Some of those witnesses, he said, identified Marshall. *Id.* at 260:14–21. One of the detectives, presumably Heier, explained, "Just because someone died doesn't mean that people go away to jail for the rest of their life." He then reminded Marshall he was "only sixteen years old." Marshall responded, saying, "I, I didn't have nothing to do with it though," and proceeded to say he was a couple of houses down from where the shooting occurred. *Id.* at 261:06–14.

One of the detectives (the transcript does not say which) then proceeded to explain to Marshall that their investigation would be reviewed by the district attorney and ultimately a judge, and it was therefore important to tell the truth, no matter what happened, about what occurred and why. *Id.* at 261:24–267:12. At that point, Marshall began to describe how Mike Winston, whose

36

nickname was "Evil," "lead me into this," and then "point[ed] the finger at me and said I was the shooter." *Id.* at 269:01–270:03. The detective then explained to Marshall that it didn't really matter who the shooter was "[b]ecause ultimately you did this together. Right? Am I right?" Marshall gave an affirmative response, but nevertheless stated that Winston was the shooter and he was a couple of houses away when Winston shot Gould. *Id.* at 270:04–12. Marshall then proceeded to explain that Winston's plan was to rob someone and that Winston had given him a .357 caliber revolver in case someone started shooting back at them. Marshall said he was walking toward Winston when he heard gunshots. *Id.* at 270:17–274:11. When one of the detectives asked Marshall if he shot the gun Winston had given him, he said he had not. The detective then said to him, "I thought you told the detective that you shot." Marshall responded that he shot into the air and claimed that he did not shoot at anyone. *Id.* at 278:11–17.

The questioning continues thereafter for another 36 pages of the transcript as the detectives insist that Marshall was seen by witnesses and that he should come clean and admit that he was the shooter. Even though he said he understood that, because of accomplice liability it makes no legal difference whether he was the shooter or not, Marshall continued his denial. *Id.* at 278–314. Finally, just before 9:00 p.m., Marshall stated, "Well I'm through. I don't want to talk no more." *Id.* at 314:17–18. At that point, all further questioning ceased.

Absent the earlier *Miranda* violation by Detectives Braunreiter and Petropoulos and their failure to "scrupulously honor" his invocation of his right to cut off questioning, there would be no doubt that Marshall's statements to Detectives Heier and Goldberg would be admissible under *Miranda*. Detectives Heier and Goldberg, in the words of the circuit court, "meticulously complied" with *Miranda*'s requirements. Having concluded, however, that the state court's determination that Detectives Braunreiter and Petropoulos complied with *Miranda* was contrary

to clearly established federal law, the question becomes what effect does this conclusion have on the admissibility of the statements Marshall later made to Detectives Heier and Goldberg.

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court held that a *Miranda* violation that results in an incriminating statement by an accused does not automatically require suppression of a later statement made after the suspect has been fully advised of his rights. But *Elstad* involved a technical violation of *Miranda* that did not involve any coercion or other improper tactics. In that case, the defendant was arrested at the home of his parents for a burglary of their neighbor's home. While one of the two arresting officers explained why they were there to the defendant's mother, the other officer, without first advising him of his *Miranda* rights, informed the defendant of the burglary and asked if he knew the family. The defendant said he knew them, and the officer then told the defendant that he was a suspect. The defendant then admitted that he was there. *Id.* at 300–01. The defendant later gave a complete statement at the police station admitting his involvement after *Miranda* warnings were provided. He later moved to suppress both statements because of the *Miranda* violation on the first, arguing that the statement he made in response to questioning at his house "let the cat out of the bag," and tainted the subsequent confession as "fruit of the poisonous tree." *Id.* at 302.

In reversing the state appellate court's holding that the second statement was inadmissible, the Court emphasized the difference between violations of *Miranda* and constitutional violations. Citing its decision in *New York v. Quarles*, 467 U.S. 649, 654 (1984), the Court noted that the prophylactic *Miranda* warnings "are not themselves rights protected by the Constitution but are instead measures to insure that the right against compulsory self-incrimination is protected." *Id.* at 305 (internal quotations and brackets omitted). Because of this difference, the Court rejected the contention that a *Miranda* violation "necessarily breeds the same consequences as police

38

infringement of a constitutional right, so that evidence uncovered following an unwarned statement must be suppressed as 'fruit of the poisonous tree.'" *Id.* at 304. That contention, the Court stated, "misconstrues the nature of the protections afforded by *Miranda* warnings and therefore misreads the consequences of police failure to supply them." *Id.* Where the violation is not of constitutional import, the Court held, exclusion of an otherwise voluntary statement given after *Miranda* warnings is not necessarily required. "[T]he absence of any coercion or improper tactics," the Court noted, "undercuts the twin rationales—trustworthiness and deterrence—for a broader rule." *Id.* at 308.

Turning to the facts before it, the Court noted that the State had conceded the issue of custody and thus the Court assumed that the arresting officer had violated *Miranda* by failing to administer the required warnings before initiating the discussion in the living room. That breach, the Court observed, "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' or it may simply have reflected Burke's reluctance to initiate an alarming police procedure before McAllister had spoken with respondent's mother." *Id.* at 315–16. "Whatever the reason for [the officer's] oversight," the Court continued, "the incident had none of the earmarks of coercion. . . . Nor did the officers exploit the unwarned admission to pressure respondent into waiving his right to remain silent." *Id.* at 316. Because the defendant's first statement, though unwarned, was voluntary, and because he was properly warned before he gave the second voluntary statement, the Court concluded that the second warned statement was properly admitted.

At the same time, the Court emphasized that it was "in no way retreat[ing] from the bright-line rule of *Miranda*." *Id.* at 317. Nor was it implying that good faith excuses a failure to administer *Miranda* warnings, or condoning "inherently coercive police tactics or methods

offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him." *Id.* The Court found instead "that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief." *Id.* at 318. "No further purpose is served," the Court concluded, "by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.*

This case differs from *Elstad* in several significant ways that make application of *Elstad* here unreasonable. First and perhaps foremost, the *Miranda* violation here was not an inadvertent failure to give the required warning, a technical violation that did not involve coercion or improper tactics. Marshall, a sixteen-year-old juvenile, was arrested at the home of his grandmother at 6:30 a.m. and taken to the Milwaukee Police Administration Building where, after initial processing, he was placed in an eight-foot-by-eight-foot interview room with no windows to the outside. He was left to sit by himself for three hours before Detectives Braunreiter and Petropoulos began their interrogation. After he first exercised his right to cut off questioning, he was left alone in the same room for another two hours before the two detectives returned in response to his attempt to find out what was going on. Other than bathroom breaks, he remained in that same room for more than twelve hours, despite repeatedly telling the detectives he had nothing to say and did not want to talk with them. The detectives ignored or misstated his attempts to cut off questioning and continued talking to him until they convinced him to answer their questions. For the reasons explained above, this was a blatant violation of *Miranda* and *Michigan v. Mosley*.

This case also differs from *Elstad* in that that admissions obtained from Marshall by Detective Braunreiter were far more extensive than unwarned succinct admission by the defendant in *Elstad* that he was there at the time of the burglary under investigation in that case. Here, after

40

hours of pushing against Marshall's repeated denials that he was at the scene or had any knowledge of the shooting, Detective Braunreiter was able to elicit admissions from Marshall that not only was he there, but that Winston had given him a .357 revolver, that he accompanied Winston to act as a lookout knowing Winston intended to kill someone, and that he had fired the gun he was given. In addition, this case differs from *Elstad* in that the *Miranda*-compliant interview added little to what Marshall had already told Detective Braunreiter. Also significant is the fact that the detectives at the second interview reminded Marshall that he had already talked to Detective Braunreiter and had already told Detective Braunreiter that he fired his gun.

It is true that the *Miranda*-compliant interview in this case was conducted in a different interview room by a different set of detectives, and it was initiated at Marshall's request after he had successfully invoked his right to remain silent and only after the detectives took great care to ensure Marshall fully understood his rights and the importance of what he was doing. But the impact of the previous hours of questioning, coupled with the admissions he had already made by that time, substantially undermined whatever effectiveness the warnings might otherwise have had. To apply *Elstad* so as to allow use of Marshall's statement to Detectives Heier and Goldberg would condone "inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him." *Id.* at 317. This is precisely what the Court in *Elstad* explicitly refused to do. *Id.*

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Court recognized an exception to *Elstad*'s rule allowing use of the second statement when the first unwarned statement was part of a tactic utilized by law enforcement to circumvent *Miranda*'s requirement that warnings be given before custodial interrogation. No single test emerged from the plurality opinion, however, and since this is not a "failure to warn" case in any event, *Seibert* is largely inapposite. To the extent it applies

41

at all, however, *Seibert* strongly supports the conclusion that Marshall's statements during the interrogation by Detectives Heier and Goldberg are not admissible. For as the plurality noted, "[b]y any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.* at 613. *Miranda*'s required warnings would be even less effective where the confession of a juvenile has already been obtained by disregarding the very rights the warnings are intended to insure.

## CONCLUSION

In sum, for the reasons set forth above, the court concludes that Marshall is entitled to relief under § 2254. The adjudication of his *Miranda* claim by the Wisconsin Court of Appeals resulted in a decision that was contrary to or an unreasonable application of *Michigan v. Mosley* and *Oregon v. Elstad*. Marshall's petition for relief under 28 U.S.C. § 2254 is therefore granted, and he is ordered released from custody unless, within 90 days of the date of this decision, the State initiates proceedings to retry him. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 22nd day of April, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court

42